**ORIGINAL**

| AG 91 (Rev. 11/82) | **CRIMINAL COMPLAINT** | | |
|---|---|---|---|
| UNITED STATES DISTRICT COURT | | CENTRAL DISTRICT OF CALIFORNIA | |
| UNITED STATES OF AMERICA v. | | DOCKET NO. FILED SEP 30 2017 CENTRAL DISTRICT OF CALIFORNIA BY DEPUTY | |
| VICTOR SILLAS | | MAGISTRATE'S CASE NO. 17MJ02444 | |
| Complaint for violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B)(i) | | | |
| NAME OF MAGISTRATE JUDGE HONORABLE LOUISE A. LAMOTHE | | UNITED STATES MAGISTRATE JUDGE | LOCATION Santa Barbara, California |
| DATE OF OFFENSE September 30, 2017 | PLACE OF OFFENSE San Luis Obispo County | ADDRESS OF ACCUSED (IF KNOWN) | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. §§ 841(a)(1), (b)(1)(B)(i)]

On or about September 30, 2017, in Santa Barbara County, within the Central District of California, defendant VICTOR SILLAS knowingly possessed with intent to distribute at least 100 grams of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE: N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT **MICHAEL SLOVEK** |
|---|---|
| | OFFICIAL TITLE Special Agent - FBI |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE | DATE September 30, 2017 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Scott M. Lara x0427    REC: Detention

## AFFIDAVIT

I, Michael Slovek, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against and arrest warrant for VICTOR SILLAS ("SILLAS") for a violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute heroin).

2. This affidavit is also made in support of an application for a search warrant to search two cellular telephones and one SIM card (the "SUBJECT DEVICES"), described more fully in Attachment A, incorporated by reference, for evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute a controlled substance) and 846 (conspiracy to distribute a controlled substance), as described in Attachment B, incorporated by reference.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF FBI SPECIAL AGENT MICHAEL SLOVEK

4. I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been employed as such since July 2010. I am currently assigned to the Los Angeles Field Division, Central Coast Safe Streets Taskforce ("CCSSTF"). CCSSTF is a task force of agents and officers from federal, state, and local agencies, assigned to investigate gang related crimes and large-scale drug trafficking. I am an investigative or law enforcement officer of the United States and I am empowered to conduct investigations of, and to make arrests for, among other offenses, drug offenses enumerated in Title 21 of the United States Code.

5. During my employment with FBI, I have received several hundred hours of comprehensive, formal instruction on such topics as drug identification, money-laundering techniques, patterns of drug trafficking, complex conspiracies, investigative techniques regarding drug traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques. I have assisted in investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of drugs and other controlled substances, and conspiracies associated with drug offenses. I have been involved in drug-related arrests that resulted in the seizure of drugs and other evidence.

6. During my training and through the course of my employment with FBI, I have utilized a variety of investigative

techniques and resources, including, but not limited to, surveillance, use of confidential sources, undercover operations, telephone toll analysis, installation, monitoring and retrieval of trackers, and wire intercept communications analysis in Title III and wiretap investigations. As such, I am familiar with coded language utilized by drug traffickers.

7. I am familiar with drug traffickers' methods of operation including the distribution, storage, and transportation of drugs, and the collection of money that represents the proceeds of drug trafficking and money laundering. I have also participated in investigations involving the installation, use, and maintenance of electronic tracking devices to motor vehicles, which have led me to the confines of hotels, motels, businesses, and private residences.

### III. SUMMARY OF PROBABLE CAUSE

8. Cooperating defendants in a federal prosecution identified SILLAS as a source of drug supply for a Drug Trafficking Organization ("DTO"). On September 30, 2017, SILLAS sold a Confidential Human Source ("CHS") at least 100 grams of heroin in exchange for $11,000 and a future debt.

### IV. STATEMENT OF PROBABLE CAUSE

9. Based on my observations, my review of the case file, and my conversations with law enforcement personnel and witnesses, I know the following:

**A. Background**

10. In October 2013, based on information received from local law enforcement and witness proffers, the FBI CCSSTF began

investigating a DTO led by Tony Rocha. On April 3, 2015, thirteen members of the Rocha DTO were charged in a 17-count indictment with conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846, along with related substantive offenses, in United States v. Rocha, et al., CR No. 15-174-MWF. Following their arrests, multiple defendants said in law enforcement interviews that SILLAS was their drug supplier.

11. According to CHS, in the spring of 2015, SILLAS approached a CHS[1] regarding a drug debt the Rocha DTO allegedly owed to SILLAS. SILLAS went to CHS's residence and claimed that the Rocha DTO owed him $30,000. Later in 2015, SILLAS returned to CHS's residence, this time requesting less money ($3,000) to satisfy the drug debt but threatening CHS's family if CHS failed to pay.

**B. SILLAS Offers to Sell Heroin to CHS**

12. According to CHS, on or about August 7, 2017, CHS spoke with SILLAS, at (323) 805-1599 ("SILLAS's 323 Phone"). Based on the subscriber data to SILLAS's 323 Phone, I know that SILLAS's 323 Phone is a cellular phone subscribed to Daniel

---

[1] CHS has a criminal history that includes convictions for misdemeanor driving under the influence in 2007; misdemeanor taking a vehicle without the owner's consent in 2007; misdemeanor resisting a public officer in 2008; misdemeanor concealing information related to rabies exposure in 2010; misdemeanor battery in 2012; CHS also pled guilty to a violation of Title 21, United States Code, Section 841(a)(1)(A)(viii) in 2017. CHS has not received monetary compensation for participating in operations but may receive financial compensation for operational costs that have occurred or may be incurred in the future. CHS is cooperating for potential sentencing consideration related to CHS's 2017 guilty plea. CHS's information has been verified by audio recordings of telephone conversations CHS has had with SILLAS. To the best of my knowledge, CHS is considered reliable.

4

Sillas. However, I know that this phone is used by Victor SILLAS because we have obtained and I have reviewed multiple recorded conversations with SILLAS using SILLAS's 323 Phone. As directed by law enforcement, CHS asked SILLAS if CHS could pay SILLAS the $3,000 debt and receive "tires" on consignment in return. Law enforcement instructed CHS to use "tires" as code for heroin, consistent with language SILLAS had used for heroin in conversations with Tony Rocha. SILLAS said he had to talk to some people and wanted to meet in person.

13. On or about August 19, 2017, CHS conducted a consensually recorded telephone call with SILLAS at SILLAS's 323 Phone. The conversation contained coded language. Based on my training and experience, and familiarity with the investigation, I understood that SILLAS stated that he was in Nipomo, CA, and wanted to meet; he also said he would not front a full kilogram of heroin to CHS, but would sell CHS one-half kilogram of heroin for $15,000, plus the $3,000 needed to satisfy the prior drug debt.

14. On or about August 21, 2017, I showed CHS a DMV photograph of SILLAS. CHS identified the individual depicted as the person CHS knew as "Victor."

15. According to CHS, CHS had further conversations with SILLAS, using SILLAS's 323 Phone, to coordinate meetings, the repayment of the drug debt, and the sale of drugs. For example:

    a. On September 14, 2017, CHS received a call from SILLAS. Using coded language, SILLAS stated he could front a kilogram of heroin to CHS if the CHS could pay $5,000 as a down

payment. SILLAS said he planned to travel to CHS' area on September 23, 2017, to complete the transaction.

      b. On September 18, 2017, CHS received another call from SILLAS. SILLAS said he would be coming to CHS's area on Friday (September 22, 2017), Saturday (September 23, 2017), or Sunday (September 24, 2017).

      c. On September 20, 2017, CHS conducted a consensually recorded telephone call with SILLAS. They discussed when they would meet and SILLAS asked if CHS had "the five," a reference to $5,000 discussed in earlier calls. CHS asked SILLAS what he was planning on bringing up, and SILLAS responded "half of the equipment." CHS responded that CHS had "eleven," referring to $11,000, and asked if the CHS could get "the full equipment." SILLAS responded, "yeah, I'll talk to my boy."

16. On September 20, 2017, the Honorable Louise A. LaMothe, United States Magistrate Judge, issued a warrant authorizing the disclosure of geolocation data for SILLAS's 323 Phone.

17. I began receiving GPS pings for the location of SILLAS's 323 Phone on September 21, 2017, at approximately 1:16 p.m.

      a. On September 21, 2017, the pings appeared to show SILLAS's 323 Phone traveling south from East Los Angeles to San Diego. The phone appeared to briefly go across the border into Mexico near the San Ysidro port of entry and back to the United States side of the border by the next ping, which occurred

approximately 15 minutes later. The phone appeared to travel north again from the border and stayed near San Diego for the rest of September 21, 2017.

   b. From September 22, 2017, at approximately 7:57 p.m. to September 26, 2017, at approximately 9:43 p.m., during each ping attempt, we received a message from SILLAS's 323 Phone's carrier which informed us that the carrier could not provide us with a ping for SILLAS's 323 Phone because the phone was either powered off or in an area with no signal.

  18. On Saturday, September 23, 2017, at approximately 6:30 p.m., a relative of CHS went to CHS's residence to check on animals (CHS was not home at the time, based upon instruction from law enforcement handlers). CHS's relative noticed a note taped to the front door of the residence, which said that Moreno/Pelon had come looking for CHS, and left the number "805-867-4677" ("SILLAS's 805 Phone") for CHS to call. CHS told me that CHS believes other members of the Rocha DTO used to refer to SILLAS as "Pelon."

  19. On September 23, 2017, at approximately 6:45 p.m., CHS called the number left on the note, SILLAS's 805 Phone, and spoke with SILLAS. CHS told me that CHS and SILLAS discussed what had happened on September 23, 2017. Specifically, SILLAS told CHS that he had brought the "full thing" and "ten extra parts" and had gone to CHS's residence twice. SILLAS told CHS the total amount CHS would owe for what he brought was "50."

  20. Based on my training and experience and familiarity with the investigation, I believe SILLAS was using coded

language to state he brought a kilogram plus ten ounces of heroin, for a total cost of $50,000.

21. CHS told me that in the evening of September 23, 2017, SILLAS called CHS multiple times using SILLAS's 805 Phone to attempt to arrange a location to meet.

22. On September 29, 2017, CHS told me that CHS received a call from SILLAS who was using SILLAS's 323 Phone. CHS and SILLAS agreed to meet between 7 a.m. and 8 a.m. on September 30, 2017. CHS told SILLAS to meet CHS around the back of CHS's residence in Nipomo, California.

   C.   **SILLAS Sells at Least 100 Grams of Heroin to CHS**

23. On September 30, 2017, at approximately 5:30 a.m., SAs and Task Force Officers ("TFOs") of the FBI set up surveillance and recording equipment for a controlled purchase of heroin by CHS from SILLAS.

24. On September 30, 2017, at approximately 6:45 a.m., CHS received a call from SILLAS who was using SILLAS's 323 Phone. SILLAS told CHS that he would be at CHS's residence soon.

25. CHS told me that CHS saw the lights of a vehicle pull up in front of the residence. CHS opened the front door and saw a car parked there. CHS went to the back of CHS's house and observed SILLAS walking towards CHS's residence.

26. According to CHS, CHS and SILLAS shook hands, and SILLAS handed CHS a brown bag from McDonald's and said "here's the stuff." I had previously placed audio recording equipment on the CHS to record his conversation with SILLAS. I also

monitored the audio of CHS's interaction with SILLAS in real time.

27. CHS told me that CHS opened the bag to confirm the contents. He saw napkins on top, and a big plastic bag underneath. CHS opened the plastic bag and saw what appeared to be heroin.

28. CHS also told me that after CHS saw the contents of the bag, CHS took $11,000 from CHS's pocket and gave it to SILLAS. CHS asked SILLAS if he wanted to count it, but SILLAS declined and said he trusted CHS.

29. SILLAS told CHS that CHS would owe "30" for the narcotics he had delivered. SILLAS stated, they could "move more" and CHS could begin to pay back the debt incurred by the Rocha DTO. Based on my training, experience, and familiarity with the investigation, I believe SILLAS was telling CHS that CHS owed $30,000 more for the narcotics SILLAS had delivered.

30. According to the CHS, CHS and SILLAS had further conversation regarding narcotics trafficking. Using slang, SILLAS stated he had access to "chiva," cocaine and methamphetamine. Based on my training and experience, and familiarity with the investigation, I believe "chiva" is a slang term for heroin.

31. According to the CHS, using coded language, SILLAS stated he used to obtain the drugs from the San Diego area, but now gets it somewhere closer, so he doesn't have to drive as far to CHS.

9

32. According to the CHS, SILLAS stated he was going to change his phone number and advised CHS to do the same.

33. According to the CHS, SILLAS stated he was going to drop off another "five", and make $100,000. Based on my training and experience, and familiarity with the investigation, I believe SILLAS was telling CHS that SILLAS was going to sell five kilograms of heroin.

34. After SILLAS left the area, I collected the recording equipment and a large amount of what appeared to be heroin with SA Daniel Diaz and TFO Sean Lusk.

35. On September 30, 2017, SA Diaz and TFO Lusk weighed the package containing the heroin given to CHS and determined it weighed approximately 1,193 grams with the packaging. The heroin has not been weighed without the packaging; however, based on my training and experience, and on my visual inspection of the package, I believe that there is 100 grams or more of heroin in the package.

36. Geolocation data from SILLAS's 323 Phone mirrored SILLAS's movements. The data showed the phone leaving the Los Angeles area at approximately 9:30 p.m. on Friday, September 29, 2017. Geolocation data showed the phone stop near a rest stop off the 101 freeway near Gaviota, CA, from approximately 11:25 p.m. until approximately 5:55 a.m. on September 30, 2017. At approximately 5:55 a.m., the data showed the phone continued north toward CHS's residence, which is consistent with SILLAS traveling to meet CHS.

37. Based on the above-described controlled purchase of heroin, California Highway Patrol Officer Franco conducted a traffic stop of SILLAS at approximately 7:48 a.m. on September 30, 2017. At that time, we arrested SILLAS.

38. TFO Lusk conducted an inventory search of the car SILLAS was driving and told me what he found in the car. TFO Lusk found $11,000, two cell phones and a loose SIM card. The SIM card is a MOVI* brand SIM card, and was located in the center console. One cell phone is a black ZTE Cricket Wireless phone, found in a holder attached to the front windshield, with serial number: 320175546657 and IMEI number: 863132033596401. The other cell phone is a black ZTE cell phone, model Z970, FCCID: SRQZ970, and is cracked on the front bottom right corner of the phone, and was found in the glove compartment.

## V. TRAINING AND EXPERIENCE ON USE OF DIGITAL DEVICES AND DRUG TRAFFICKING

39. Drug traffickers often use electronic devices such as cellular telephones and personal digital assistants such as iPhone and Blackberry devices in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities. Drug traffickers may use SIM cards to transfer information from one phone to another. The purpose of drug traffickers' communications on their phones is to facilitate drug trafficking, coordinate the movements of the trafficker and various co-conspirators, and coordinate the amount of controlled substances trafficked, as well as payment amounts and methods. These communications often include phone

calls, text messaging, and email communications between the trafficker and the co-conspirators, and these communications often occur significantly in advance of the narcotics transaction. Drug traffickers often keep the documents and records related to their illicit activities on their digital devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members and significant others, in order to avoid detection by law enforcement. Drug traffickers tend to keep these phones, SIM cards, and other electronic devices close to them, either on their person, in their cars, or at their residences.

40. Drug traffickers frequently take, or cause to be taken, photographs and videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs. Such items are often stored in their digital devices.

41. Data contained on electronic devices used by drug traffickers often includes, among other things, records of telephone calls, text messages, social media, and e-mail communications between traffickers and co-conspirators; photos and recordings of controlled substances used to negotiate deals; Global Positioning System ("GPS") information and other location information that can help identify stash locations, meeting places, and trafficking routes; and information that can be used to identify the trafficker and co-conspirators, such as contact lists, calendar appointments, photographs, and videos.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

42. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

    a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

    b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

    c. It is difficult to determine with certainty the amount of storage space in each digital device described in Attachment A. However, I understand that cellular telephones

often contain multiple gigabytes of storage space. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

        d. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.[2] Electronic files saved to a hard drive can be stored for years with little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed

---

[2] These statements do not generally apply to data stored in volatile memory such as random-access memory, or "RAM," which data is, generally speaking, deleted once a device is turned off.

14

amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

      e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently

used. Web browsers, e-mail programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

    f. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

    g. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

 43. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. CONCLUSION

 44. For all the reasons described above, there is probable cause to believe that VICTOR SILLAS has committed a violation of 21 U.S.C. § 841(a) (possession with intent to distribute

heroin). Also, for all the reasons described above, there is probable cause to believe that the items described in Attachment B are evidence, fruits, and instrumentalities of the offenses described in Attachment B, and will be found in the digital devices described in Attachment A.

_____
MICHAEL SLOVER, Special Agent
Federal Bureau of
Investigation

Subscribed to and sworn before me
this 30th day of September, 2017.

_____
UNITED STATES MAGISTRATE JUDGE

ORIGINAL

FINDING RE PROBABLE CAUSE

On September 30, 2017, at  6:45  p.m., Special Agent Michael Slovek of the Federal Bureau of Investigation appeared before me regarding the probable cause arrest of defendant VICTOR SILLAS, occurring on September 30, 2017, at Nipomo, California.

Having reviewed the agent's statement of probable cause, a copy of which is attached hereto, the Court finds that there **exists**/~~does not exist~~ probable cause to arrest the defendant for a violation of Title 21, United States Code, Section 841(a)(1).

/✓/ It is ordered that defendant VICTOR SILLAS be held to answer for proceedings under Federal Rule of Criminal Procedure 5 / 40 on  October 2, 2017.

/___/ It is ordered that defendant VICTOR SILLAS be discharged from custody on this charge forthwith.

DATED: Sept. 30, 2017 at 5:45 ~~a.m.~~/p.m.

_____
UNITED STATES MAGISTRATE JUDGE